UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

_____

STEVEN MONTEZ,

               Petitioner,

v.

CATHERINE BAUMAN,

               Respondent.

_____/

Case No. 2:24-cv-171

Honorable Phillip J. Green

### OPINION

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, the parties consented to proceed in all matters in this action under the jurisdiction of a United States magistrate judge. (ECF No. 1, PageID.19; ECF No. 10.)

Petitioner Steven Montez is incarcerated with the Michigan Department of Corrections at the Alger Correctional Facility (LMF) in Munising, Alger County, Michigan. Following a jury trial in the Kent County Circuit Court, Petitioner was convicted of one count of first-degree criminal sexual conduct (CSC-I), in violation of Mich. Comp. Laws § 750.520b. On February 11, 2020, the trial court sentenced Petitioner to 15 to 50 years of incarceration.

On September 22, 2024, Petitioner filed his habeas corpus petition raising the following six grounds for relief:

I.  Trial counsel was ineffective for failing to consult or call an expert witness to rebut the prosecution's expert witness regarding child sexual abuse disclosure and treatment.

II. Mr. Montez was denied a fair trial when the prosecution improperly characterized Thomas Cottrell's expert testimony as a corroboration of the complainants' stories. Further, the trial court's refusal to give a curative instruction was reversible error.

III. Mr. Montez was denied a fair trial when the complaining witness had an emotional breakdown and her loved ones rushed to the witness stand to comfort her in front of the jury, and the trial court did nothing to cure the error.

IV. Mr. Montez was denied a fair trial when the prosecutor appealed to the jury's sympathies and sense of civic duty in closing argument. The trial court erred in denying Mr. Montez's motion for a mistrial and failing to do anything to address the error.

V.  Individually and/or cumulatively, the above grounds entitle Mr. Montez to a new trial.

VI. The inclusion of irrelevant information, i.e. descriptions and references of acquitted conduct, in Mr. Montez's PSIR is erroneous. Trial counsel was ineffective for failing to object. This Court should remand to correct the PSIR.

(§ 2254 Pet., ECF No.1, PageID.5, 7, 9, 12, 15, 16.) Respondent contends that

Petitioner's grounds for relief are meritless. (ECF No. 7.)[1] For the following reasons,

---

[1] Respondent also contends that some of Petitioner's grounds for relief are unexhausted and procedurally defaulted. (ECF No. 7.) Respondent does recognize, however, that a habeas corpus petition "may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." *See* 28 U.S.C. § 2254(b)(2). Furthermore, the Supreme Court has held that federal courts are not required to address a procedural default issue before deciding against the petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."); *see also Overton v. Macauley*, 822 F. App'x 341, 345 (6th Cir. 2020) ("Although procedural default often appears as a preliminary question, we may decide the merits first."); *Hudson v. Jones*, 351 F.3d 212, 215–16 (6th Cir. 2003) (citing *Lambrix, 520 U.S. at 525; Nobles v.*

the Court concludes that Petitioner has failed to set forth a meritorious federal ground for habeas relief and will, therefore, deny his petition for writ of habeas corpus.

## Discussion

### I.    Factual Allegations

The Michigan Court of Appeals described the facts underlying Petitioner's conviction as follows:

> [Petitioner's] conviction relates to his sexual abuse of NE. He was specifically convicted of CSC-I on the basis that he engaged in penile-oral penetration with NE. [Petitioner] was also charged with an additional count of CSC-I, relating to NE's sister, AE. As charged, [Petitioner] was alleged to have engaged in penile-vaginal penetration with AE. The jury, however, found [Petitioner] not guilty of the count related to AE.
>
> NE and AE are the children of [Petitioner's] former girlfriend. According to NE and AE's mother, she and her children lived with [Petitioner] in Grand Rapids between 2004 and May 2008. Her relationship with [Petitioner] ended in 2008, and she and her children moved out of his house at that time. According to the testimonies of NE and AE, [Petitioner] sexually abused them while they lived in his home. NE testified about being abused on numerous occasions and, in particular, being forced to perform oral sex on [Petitioner] in exchange for candy. NE did not, however, recall specifically when the abuse occurred. AE described one instance of sexual assault. AE testified that she had repressed this memory for years before remembering it during a sexual encounter with her boyfriend.
>
> In addition to the events relating to AE and NE, at trial, the prosecutor also introduced other-acts evidence asserting that [Petitioner] committed acts of criminal sexual conduct against three of his nieces: JP, EM, and MD. The events involving [Petitioner's] nieces were reported to have occurred between approximately 1997 and 2007.

_Johnson_, 127 F.3d 409, 423–24 (5th Cir. 1997); 28 U.S.C. § 2254(b)(2)). Here, rather than conduct a lengthy inquiry into exhaustion and procedural default, judicial economy favors proceeding directly to a discussion of the merits of Petitioner's claims.

[Petitioner's] nieces reported the sexual abuse by defendant in 2008, prompting a police investigation at that time. MD also told NE and AE's mother about [Petitioner's] conduct, which prompted her to end her relationship with [Petitioner] and move out of his house.

Shortly after allegations were made by defendant's nieces, AE and NE were asked about [Petitioner] and whether he had done anything inappropriate to them. Neither disclosed any abuse at that time; NE and AE were not made aware of the allegations of [Petitioner's] sexual abuse of his nieces. Years later, when NE was a freshman in high school, NE told a friend and NE's mother about the abuse, but the matter was not reported to authorities at that time. Later, in September 2018, AE reported the abuse to Children's Protective Services, prompting an investigation that eventually led to the charges and trial in this case.

*People v. Montez*, No. 2022 WL 726902, at *1 (Mich. Ct. App. Mar. 10, 2022).

Jury selection for Petitioner's trial occurred on December 2, 2019. (Trial Tr. I, ECF No. 8-3.) Over the course of three days, the jury heard testimony from numerous witnesses, including NE, AE, Petitioner's nieces, AE's boyfriend at the time, an investigator from Children's Protective Services, and Thomas Cottrell, the Chief Programming Officer for the YWCA—West Central Michigan. (Trial Tr. II, III, & IV, ECF Nos. 8-4, 8-5, 8-6.) On December 6, 2019, after about three hours of deliberation, the jury returned a guilty verdict with respect to the CSC-I charge involving NE. (Trial Tr. V, ECF No. 8-7, PageID.1327.) Petitioner appeared before the trial court for sentencing on February 11, 2020. (ECF No. 8-8.)

Petitioner, through counsel, appealed his conviction and sentence to the Michigan Court of Appeals, raising the six claims Petitioner now asserts as his habeas grounds for relief, as well as a claim that imposition of lifetime electronic monitoring violated Petitioner's rights under the Ex Post Facto Clause, Petitioner's right to a jury trial, and Petitioner's due process rights. (ECF No. 8-11.) On March

4

10, 2022, the court of appeals affirmed Petitioner's conviction but remanded "with instructions to amend the judgment of sentence to remove the lifetime-electronic monitoring requirement." *See Montez*, 2022 WL 726902, at *1. On March 8, 2024, the Michigan Supreme Court denied Petitioner's application for leave to appeal. *See People v. Montez*, 2 N.W.3d 916 (Mich. 2024). This § 2254 petition followed.

## II.    AEDPA Standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly

established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "[W]here the precise contours of

the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotation marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721.  Then, the petitioner's claim is reviewed *de novo*. *Id.* (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

## III.    Discussion

### A.    Ground I—Ineffective Assistance of Counsel

Petitioner's first ground for relief is that trial counsel was ineffective "for failing to consult or call an expert witness to rebut the prosecution's expert witness regarding child sexual abuse disclosure and treatment." (§ 2254 Pet., ECF No. 1, PageID.5.)  According to Petitioner, had counsel called an expert, the expert could have refuted allegedly incorrect information presented by the prosecution's witness, including "the percentage of delayed disclosures, trauma producing disjoined memories, and an erroneous claim about false memories requiring a deliberate process, such as coaching." (*Id.*)

As background, as part of his direct appeal, Petitioner filed a motion to remand with the court of appeals, asking that the court of appeals send the matter back to the trial court to conduct a *Ginther* hearing[2] "to further develop the record in support [of] his claim that his trial counsel was ineffective."  *Montez*, 2022 WL 726902, at *4. Petitioner attached to that motion an affidavit from Dr. David Thompson, a clinical

---

[2] A hearing under *People v. Ginther*, 212 N.W.2d 922 (Mich. 1973), allows a criminal defendant to proffer facts or evidence in support of a claim of ineffective assistance of counsel. *See Ceasor v. Ocwieja*, 655 F. App'x 263, 266, 271 (6th Cir. 2016).

and forensic psychologist.  *Id.*  The court of appeals summarized the contents of that affidavit as follows:

> According to Dr. Thompson, half of child-sexual-assault disclosures are delayed. Dr. Thompson additionally averred that "traumatic memories are generally more fully and completely recollected than non-traumatic memories." He also addressed the creation of false memories. According to Dr. Thompson, there is ample research that children can form false memories "without deliberate coaching by an adult." He averred that "source misattribution errors occur on their own without any prompting" as a result of overhearing conversations, improper questioning about abuse, and unspecified "psychotherapeutic techniques that are used to treat children that have experienced trauma."
>
> Dr. Thompson additionally averred that he was not aware of any "credible evidence that false memories fade more quickly than other memories." Finally, Dr. Thompson also addressed "co-witness conformity," a subject not mentioned at all during trial. According to Dr. Thompson, cowitness conformity "is the process by which individuals who witnessed an event may be influenced by co-witnesses. When two individuals talk about their individual experiences of a similar event, the conversation may result in changes to one or both individuals' memories." Dr. Thompson's affidavit specifically addressed a cowitness-conformity study demonstrating its effect on young children and preteens.

*Id.*  The court of appeals denied Petitioner's motion to remand without prejudice, and Petitioner filed a renewed motion to remand shortly before the court of appeals conducted oral argument in his case.  *Id.*

### 1.    Standard of Review

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the petitioner

resulting in an unreliable or fundamentally unfair outcome.  *Id.* at 687.  A court

considering a claim of ineffective assistance must "indulge a strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance."

*Id.* at 689.  The petitioner bears the burden of overcoming the presumption that the

challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v.*

*Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135

(6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The

court must determine whether, in light of the circumstances as they existed at the

time of counsel's actions, "the identified acts or omissions were outside the wide range

of professionally competent assistance."  *Strickland*, 466 U.S. at 690.  Even if a court

determines that counsel's performance was outside that range, the petitioner is not

entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal

court reviews a state court's application of *Strickland* under § 2254(d), the deferential

standard of *Strickland* is "doubly" deferential.  *Harrington*, 562 U.S. at 105 (citing

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S.

12, 15 (2013); *Cullen*, 563 U.S. at 190; *Premo v. Moore*, 562 U.S. 115, 122 (2011).

Scrutiny of counsel's performance is "highly deferential", per *Strickland*, to avoid the

temptation to second guess a strategy after-the-fact and to "eliminate the distorting

effects of hindsight."  *Strickland*, 466 U.S. at 689.  Scrutiny of the state court's

scrutiny of counsel's performance must also be deferential, per 28 U.S.C. § 2254(d).

In light of that double deference, the question before the habeas court is "whether

there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740–41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA" (citing *Harrington*, 562 U.S. at 102)).

Petitioner raised his ineffective assistance claim on direct appeal, and the court of appeals addressed it under the following standard:

> "To establish ineffective assistance of counsel, defendant must show (1) that defense counsel's performance was below an objective standard of reasonableness under prevailing professional norms and (2) that there is a reasonable probability that, but for counsel's errors, a different outcome would have resulted." *People v. Jackson*, 292 Mich. App. 583, 600–601, 808 N.W.2d 541 (2011). "Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *People v. Solmonson*, 261 Mich. App. 657, 663, 683 N.W.2d 761 (2004). "Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim." *People v. Carbin*, 463 Mich. 590, 600, 623 N.W.2d 884 (2001).

*Montez*, 2022 WL 726902, at *5. Although the court of appeals cited state law, the standard is identical to the one set forth in *Strickland*. Moreover, *Carbin* identifies *Strickland* as the source of the standard. *See Carbin*, 623 N.W.2d at 889.

The court of appeals' application of the correct standard eliminates the possibility that the resulting decision is "contrary to" clearly established federal law. As the Supreme Court stated in *Williams v. Taylor*:

> The word "contrary" is commonly understood to mean "diametrically different," "opposite in character or nature," or "mutually opposed." Webster's Third New International Dictionary 495 (1976). The text of § 2254(d)(1) therefore suggests that the state court's decision must be substantially different from the relevant precedent of this Court. The Fourth Circuit's interpretation of the "contrary to" clause accurately

reflects this textual meaning. A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.

*Williams*, 529 U.S. at 405.  The Court went on to offer, as an example of something that is not "contrary to" clearly established federal law, the following:

> [A] run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s "contrary to" clause. Assume, for example, that a state-court decision on a prisoner's ineffective-assistance claim correctly identifies *Strickland* [*v. Washington*, 466 U.S. 668 (1984),] as the controlling legal authority and, applying that framework, rejects the prisoner's claim. Quite clearly, the state-court decision would be in accord with our decision in *Strickland* as to the legal prerequisites for establishing an ineffective-assistance claim, even assuming the federal court considering the prisoner's habeas application might reach a different result applying the *Strickland* framework itself. It is difficult, however, to describe such a run-of-the-mill state-court decision as "diametrically different" from, "opposite in character or nature" from, or "mutually opposed" to *Strickland*, our clearly established precedent. Although the state-court decision may be contrary to the federal court's conception of how *Strickland* ought to be applied in that particular case, the decision is not "mutually opposed" to *Strickland* itself.

*Id.* at 406. Therefore, because the court of appeals applied the correct standard, Petitioner can only overcome the deference afforded state court decisions if the determination regarding Petitioner's ineffective assistance claim is an unreasonable application of *Strickland* or if the court of appeals' resolution was based on unreasonable determinations of the facts. 28 U.S.C. 2254(d).

### 2.    Analysis

After setting forth the standard, the court of appeals noted that "although [Petitioner's] offer of proof may have potentially warranted factual development on the adequacy of counsel's performance," Petitioner was not entitled to a new trial or a *Ginther* hearing because he "[could not] establish prejudice from counsel's failure

to consult or call an independent expert in child sexual abuse and false memories."
*Montez*, 2022 WL 726902, at *5.  Essentially, the court of appeals concluded, "the
proposed testimony from Dr. Thompson [did] not establish a reasonable probability
of a different outcome."  *Id.*

The court of appeals then engaged in a lengthy analysis of Dr. Thompson's
testimony, as well as the testimony presented at trial. First, the court of appeals
compared testimony regarding delayed disclosures:

> First, [Petitioner] maintains that Cottrell inaccurately testified that
> upwards of 69% of child-sexual-abuse victims delay their disclosure
> when, according to Dr. Thompson, only half of disclosures are delayed
> and approximately half of all disclosures occur "close in time" to the
> alleged abuse. In actuality, Cottrell testified that "half" or "more than
> half" of abuse disclosures are delayed. He asserted that the percentage
> varies, depending "on the study one looks at," and that "sometimes it's
> upwards of 69 percent." In other words, Cottrell acknowledged there
> were different studies on the topic of delayed disclosure, and he even
> testified that "half" of the disclosures are delayed. His testimony is not
> materially inconsistent with Dr. Thompson's view on the topic.
> Furthermore, in his affidavit, Dr. Thompson specifically relied on a
> study published in 2020, which was *after* the trial in the current case,
> making it hard to see how this testimony could have been presented or
> how Cottrell could be challenged for not knowing of a study that did not
> exist when he testified. Additionally, and perhaps most importantly, the
> basic point of Cottrell's testimony is that, contrary to popular perception,
> not all children immediately report abuse and in fact many children
> delay reporting. This is true whether the percentage of delayed reports
> is 50% or 69%. Dr. Thompson's testimony on this topic would not alter
> the outcome of trial.

*Id.* at *5.  The court of appeals then compared Dr. Thompson's proposed testimony
regarding "disjointed memories" to Cottrell's testimony on trauma and memories:

> Second, Cottrell testified that trauma produces "disjointed memories"
> that are less linear than typical memories, including negative memories.
> According to Dr. Thompson, this is inaccurate, and in fact, the opposite
> is true. That is, according to Dr. Thompson, "traumatic memories are
> generally more fully and completely recollected than non-traumatic

13

memories." Although Dr. Thompson's testimony on this point would clearly contradict Cottrell's testimony on the "disjointed" nature of traumatic memories, a contradiction on this point is not reasonably likely to alter the outcome. Fairly considered, Cottrell's testimony on traumatic memories—which focused extensively on "triggers" that are likely to bring back the traumatic memories—was offered to explain *AE*'s purported incomplete memory of events, why she may have previously blocked out the abuse, and her sudden recall of the abuse during an encounter with her boyfriend. Indeed, the prosecutor used Cottrell's testimony on trauma during closing argument to argue that *AE* "did store [the memory] as a traumatic memory." Because AE purportedly experienced terror during a one-time incident of sexual assault, the prosecutor asserted that she stored the memory as a traumatic memory, she essentially blocked the memory, and she later recalled the incident when presented with a "trigger" while with her boyfriend. In this context, Dr. Thompson's proposed testimony on traumatic memory would clearly have been relevant to AE's disjointed memories of abuse. But the jury found [Petitioner] not guilty of the charge related to AE.

In comparison, Cottrell's traumatic-memory testimony had little or no relation to NE. NE did not describe triggers, blocked memories, sudden recall, or anything indicative of the traumatic-type memory that Cottrell described. And the prosecutor did not argue that NE's memories were affected by trauma. To the contrary, the prosecutor contrasted AE's one-time traumatic memory with a situation—more akin to NE's—in which "something is more frequent, happening regularly, often, on a daily or weekly basis," such that it may become "more normal, wrong, of course, but more normal, as part of life." Indeed, although acknowledging that NE's memories of abuse were not complete in terms of detail or every single act that happened, the prosecutor did *not* attribute this to trauma, but instead asserted that NE could not remember every detail because it happened on a regular basis and the events blended together. Cottrell offered testimony on how memories of repeated events can become blurred, particularly for children who do not "use the same markers" as adults in terms of time and place to organize their thoughts. He noted that it is not uncommon for children to "confuse multiple occurrences as a similar sort of event." But this testimony on multiple occurrences blurring in a child's mind had nothing to do with Cottrell's testimony on trauma, and Dr. Thompson's proposed testimony on traumatic memory would be irrelevant to the charge related to NE. In short, Cottrell's testimony on trauma did not relate to NE, and to the extent Dr. Thompson could have challenged Cottrell's testimony as related to AE's traumatic memories, it is immaterial at this juncture because the jury found [Petitioner] not guilty of the conduct related to AE. Consequently,

the dispute about the formation of traumatic memories does not establish a reasonable probability of a different outcome.

*Id.* at *6.  The court of appeals then considered the evidence and proposed evidence regarding the foundation of false memories:

> Third, [Petitioner] maintains that Dr. Thompson could have contradicted Cottrell's testimony on the formation of false memories. In this regard, during cross-examination, Cottrell testified that the creation of false memories is possible particularly in young children, but he also testified that it required a "deliberate process," such as "coaching," and that it was not something that would "occur on its own." In contrast, in his affidavit, Dr. Thompson stated that there is ample research that children can form false memories "without deliberate coaching by an adult." He averred that "source misattribution errors occur on their own without any prompting" as a result of things like "overhearing other people's conversations" or "as a result of participating in therapeutic treatment." He also stated that he is "aware of no credible evidence that false memories fade more quickly than other memories."

> Although Dr. Thompson could have contradicted Cottrell's assertion that false memories require a deliberate process, such as coaching, failure to present such testimony—and to provide additional testimony on source misattribution—did not affect the outcome of trial. To be admissible, under MRE 702, expert testimony needs to be both relevant and reliable. *People v. Kowalski*, 492 Mich. 106, 120, 821 N.W.2d 14 (2012) (opinion by Kelly, J.). "[E]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* at 121, 821 N.W.2d 14 (quotation marks and citation omitted). *See also People v. Unger*, 278 Mich. App. 210, 249, 749 N.W.2d 272 (2008). For example, in the context of child-sexual abuse, expert testimony may be offered for the purpose of explaining a specific behavior that the jury might otherwise construe as inconsistent with abuse or to rebut attacks on credibility. *People v. Peterson*, 450 Mich. 349, 372, 537 N.W.2d 857 (1995). But this is dependent on the underlying facts of the particular case in question. *See id.* That is, "*if the facts of a particular case* show that the victim delayed reporting the abuse, recanted the allegations, kept the abuse secretive, or was accommodating to the abuse, then testimony about that particular characteristic . . . would be admissible to dispel any myths the jury may hold concerning that behavior." *Id.* (quotation marks and citation omitted; emphasis added).

As applied in this case, Dr. Thompson's proposed testimony—that false memories can be created in the absence of deliberate coaching by, for example, overhearing a conversation, repeated questioning, or participating in therapy—is not particularly relevant because there is no underlying factual foundation to support that NE (or AE) may have formed false memories through source misattribution as described by Dr. Thompson. For example, there is no evidence that (1) NE or AE overheard any conversation about [Petitioner] or his conduct with his nieces, (2) they were subjected to "repeated questioning" involving improper techniques or a biased interviewer, or (3) they engaged in repeated conversations about events that did not occur. In fact, AE and NE both expressly denied knowing any of the specific allegations of the abuse that [Petitioner] perpetrated on his nieces. And the overwhelming and undisputed testimony—from their mother and [Petitioner's] nieces—was that the nature of the allegations by [Petitioner's] nieces against defendant were *never* discussed with NE or AE. At most, NE and AE were asked—without any discussion of details—as children whether anything inappropriate happened with [Petitioner], and they said no. Nothing in Dr. Thompson's description of source misattribution supports that this sort of brief and isolated questioning would or could result in the formation of false memories. Similarly, nothing in the record suggests that NE's therapy would or could have caused false memories. On this record, Dr. Thompson's testimony on source misattribution is, at most, minimally relevant, and it appears highly improbable that such testimony would have affected the outcome of the proceedings.

In the context of false memories, Dr. Thompson also asserted, in comparison to Cottrell's testimony that false memories fade more quickly than other memories, that he was not aware of any credible evidence that false memories fade more quickly than other memories. Dr. Thompson does not, however, state one way or the other whether false memories fade more quickly, last longer, or otherwise differ from true memories in terms of how long they last. Unlike with his other opinions, Dr. Thompson cites no articles or other sources related to how long false memories last in comparison to other memories. It appears that he is simply unaware of any research on this topic. Dr. Thompson's assertion that he lacks awareness of a specific topic is not particularly helpful, and it does not create a reasonable probability of a different outcome.

*Id.* at *6–7. Finally, the court of appeals considered Dr. Thompson's proposed testimony regarding "co-witness conformity":

Fourth and finally, [Petitioner] contends that Dr. Thompson could have offered testimony on "co-witness conformity," a subject not mentioned at all during trial. Considering Dr. Thompson's affidavit and the evidence in this case, Dr. Thompson's potential testimony on co[-]witness conformity is not particularly relevant on the facts of this case, and such testimony would not create a reasonable probability of a different outcome. The testimony at trial was that NE and AE did not discuss their abuse by [Petitioner] until AE was 17 years old, at which time NE was already an adult. Although Dr. Thompson vaguely asserted in his affidavit that co[-]witness conformity has been "well studied" in children *and* adults, the only detailed information he provided related to children under the age of 12, and he failed to explain how—or to what degree—it may apply to individuals over the age of 12. Moreover, Dr. Thompson discussed co[-]witness conformity in the context of altering details of memories when children were shown "slightly different" video clips of *the same event*. NE and AE never claimed to have participated in the same event. They testified that they were separately abused by [Petitioner]. Dr. Thompson failed to explain how, if at all, co[-]witness conformity applies to individuals discussing different events.

Lastly, it should be noted that NE and AE both disclosed their allegations of [Petitioner's] abuse to other people before discussing them with each other. Even if co[-]witness conformity could have conceivably altered the details of their memories, this charge of recent fabrication— albeit unconscious fabrication—is rebutted by their prior identifications of [Petitioner]. *See* MRE 801(d)(1)(B). Overall, Dr. Thompson's potential testimony on the topic of co[-]witness conformity has little relevance to the facts of this case, and it does not appear reasonably probable that this marginally probative evidence would have affected the outcome of trial.

*Id.* at *7.

"*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Harrington*, 562 U.S. at 111. Moreover, this Court has noted that the "battle of expert testimony regarding delayed disclosure plays out in many CSC-I cases." *Mosher v. Burt*, No. 1:20-cv-33, 2021 WL 2926059, at *12 (W.D. Mich. May 3, 2021) (citing *Howell v. Parish*, No. 1:19-cv-446, 2021 WL 1169846, at *9–10 (W.D. Mich. Mar. 4,

2021)).    This  battle  often  involves  a  conflict  between  testimony  that  delayed disclosure evidences fabrication and testimony that delayed disclosure is common and "follows from the difficulty inherent in disclosing sensitive sexual acts."  *Howell*, 2021 WL 1169846, at *9.  "The relatively recent social media publication of first-hand accounts  from  thousands  of  victims  revealing  pervasive  sexual  harassment  and abuse, typically never reported at the time it occurred . . ., suggests that the common experience of jurors might be enough to help them evaluate the credibility of delayed disclosures without expert assistance."  *Mosher*, 2021 WL 2926059, at *12.

Here, Petitioner only relies upon the arguments he raised before the court of appeals and offers no explanation for why he believes the court of appeals erred in its conclusion regarding prejudice.    Petitioner states only that had counsel called an expert witness, the expert witness "would have refuted [the] incorrect claims" raised by Cottrell.  (§ 2254 Pet., ECF No. 1, PageID.5.)  As set forth above, the court of appeals thoroughly discussed the reasons why Dr. Thompson's testimony would not have affected the outcome of trial.  This Court's review of the record does not support any claim that the Michigan Court of Appeals unreasonably applied Strickland or unreasonably  determined  the  facts  regarding  the  nature  and  import  of  Dr. Thompson's proposed testimony.

Furthermore, as noted by the Sixth Circuit, "the Supreme Court has held that '[i]n many instances *cross-examination will be sufficient* to expose defects in an expert's presentation.'"  *Jackson v. McQuiggin*, 553 F. App'x 575, 582 (6th Cir. 2014) (quoting *Harrington*, 562 U.S. at 111).  The record before the Court reflects that trial

counsel thoroughly cross-examined Cottrell regarding his testimony concerning delayed disclosure, disjointed memories, trauma, coach, and false memories.  (Trial Tr. IV, ECF No. 8-6, PageID.1201–1211.)   Here, Petitioner fails to present any evidence, much less clear and convincing evidence, to refute the court of appeals' conclusion that counsel's decision to not present expert testimony did not prejudice Petitioner's defense in any way.  *See Tinsley v. Million*, 399 F.3d 796, 806 (6th Cir. 2005); *see also Mosher*, 2021 WL 2926059, at *11–12 (rejecting the petitioner's claim of ineffective assistance premised upon counsel's failure to call an expert to counter testimony provided by the prosecution's expert regarding delayed disclosure).

In sum, Petitioner has failed to demonstrate that the court of appeals' rejection of his ineffective assistance claim is contrary to, or an unreasonable application of, *Strickland*.   Petitioner, therefore, is not entitled to relief with respect to habeas ground I.

### B.    Grounds Asserting Prosecutorial Misconduct and Trial Court Error

Petitioner next raises three grounds for relief asserting various incidents of prosecutorial misconduct and trial court error.  For a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219

(1982).  In evaluating the impact of the prosecutor's misconduct, a court should consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner.  *See United States v. Young*, 470 U.S. 1, 11–12 (1985).  The Supreme Court has described the *Darden* standard as "a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations.'" *Parker v. Matthews*, 567 U.S. 37, 48 (2012).  The *Parker* Court rejected an attempt to graft any additional requirements on the "very general" *Darden* standard.

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)).  Indeed, "[t]he Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (quoting *Donnelly*, 416 U.S. at, 645).  Thus, in order to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker*, 567 U.S. at 47 (internal quotation marks omitted).

### 1.    Ground II—Vouching

As ground II, Petitioner argues that he was denied a fair trial when the "prosecution improperly characterized Thomas Cottrell's expert testimony as a

corroboration of the complainants' stories." (§ 2254 Pet., ECF No. 1, PageID.7.)  He also faults the trial court for refusing "to give a curative instruction." (*Id.*)

The Sixth Circuit has identified two types of objectionable vouching. *See United States v. Acosta*, 924 F.3d 288, 299 (6th Cir. 2019); *Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008). *But see Wogenstahl v. Mitchell*, 668 F.3d 307, 328–29 (6th Cir. 2012) (treating the two aspects of vouching as part of a single standard).  The first type impermissibly places the government's prestige behind the witness to enhance his or her credibility. *See United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 2019); *United States v. Carroll*, 26 F.3d 1380, 1388–89 (6th Cir. 1994).  The second type, also known as bolstering, occurs when the prosecutor invites the jury to believe there is other evidence, known to the prosecutor but not introduced into evidence, justifying the prosecutor's belief in the defendant's guilt. *See Francis*, 170 F.3d at 551; *United States v. Medlin*, 353 F.2d 789, 796 (6th Cir. 1965).

Moreover, a prosecutor may not "offer [his or her] opinions as to credibility of a witness or the guilt of a defendant." *Cristini v. McKee*, 526 F.3d 888, 901 (6th Cir. 2008). As the Supreme Court has noted:

> The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

*United States v. Young*, 470 U.S. 1, 18–19 (1985).  However, not every reference to the credibility of a witness is objectionable vouching.  "[A] prosecutor may ask the

jury to draw reasonable inferences of credibility from the evidence presented."

*Willoughby v. White*, 786 F. App'x 506, 513 (6th Cir. 2019).

On direct appeal, the Michigan Court of Appeals addressed Petitioner's

vouching argument as follows:

> [Petitioner] first contends that the prosecutor impermissibly used Cottrell's testimony to bolster the credibility of NE and AE. When discussing witness credibility, a prosecutor may not vouch for a witness by implying that the prosecutor has some special knowledge of a witness's credibility. *People v. Thomas*, 260 Mich. App. 450, 455, 678 N.W.2d 631 (2004). The prosecutor, however, is free to comment on witness credibility and "to argue from the evidence and its reasonable inferences in support of a witness's credibility." *Bennett*, 290 Mich. App. at 478, 802 N.W.2d 627.

> In this case, the prosecutor said nothing to suggest any personal knowledge of credibility. Instead, in the portion of the prosecutor's argument challenged by [Petitioner], the prosecutor asserted that Cottrell's testimony "corroborated" the testimony given by NE, AE, and [Petitioner's] nieces. Defendant focuses on the prosecutor's statement that "Cottrell corroborated a lot of what [AE and [NE], and also the other victims, told you, you know, really in terms of how and when children disclose acts of child sexual abuse." When reviewed as a whole, the prosecutor's closing argument addressed at length how the testimony of NE, AE, and [Petitioner's] nieces compared to Cottrell's expert testimony on child sexual abuse and misconceptions regarding sexual abuse, including topics like delayed disclosure and explanations regarding memories of traumatic events as well as repeated events. The prosecutor also addressed the level of detail in reports of sexual abuse, false memories and coaching, and grooming of sexual abuse victims. Cottrell offered testimony on the various topics discussed, meaning that there was an evidentiary basis for the prosecutor's argument that the victims' behaviors and any gaps in their memories were consistent with Cottrell's testimony on the behaviors and memories of victims of child sexual abuse. *See Unger*, 278 Mich. App. at 236, 749 N.W.2d 272.

> Nevertheless, [Petitioner] maintains that the prosecutor's argument was improper because it would be impermissible for Cottrell to vouch for the victims' credibility, and it should, therefore, be impermissible to use Cottrell's testimony to bolster the victims' credibility. In making this argument, [Petitioner] relies on *People v. Thorpe*, 504 Mich. 230, 259, 934 N.W.2d 693 (2019), for the proposition that an expert in child sexual

abuse cannot vouch for a victim's credibility by, for example, testifying about the percentage of children who lie about sexual abuse. *See also People v. McFarlane*, 325 Mich. App. 507, 521-522, 926 N.W.2d 339 (2018). To be clear, in relying on *Thorpe*, [Petitioner] does not contend that *Cottrell* impermissibly vouched for the victims or otherwise offered improper testimony on credibility or [Petitioner's] guilt. Instead, defendant maintains that *the prosecutor* misused Cottrell's otherwise proper testimony during closing. [Petitioner's] argument lacks merit.

It is well recognized that, as occurred in this case, "the prosecution may present evidence, if relevant and helpful, to generally explain the common postincident behavior of children who are victims of sexual abuse." *Peterson*, 450 Mich. at 373, 537 N.W.2d 857. Moreover, "[t]he prosecution may, in commenting on the evidence adduced at trial, argue the reasonable inferences drawn from the expert's testimony and compare the expert testimony to the facts of the case." *Id.* This is precisely what occurred in this case. When the prosecutor's argument about Cottrell is read as a whole and in context, the prosecutor permissibly compared Cottrell's testimony to the facts of this case to explain the delayed disclosure of abuse, matters related to memory and "triggering" events, and other issues relevant to the behaviors of NE, AE, and [Petitioner's] nieces. This was proper under *Peterson*.

Rather than consider the prosecutor's argument as a whole, [Petitioner] reads the word "corroborated" in isolation and asserts that the use of the word "corroborate" was an attempt to use Cottrell's testimony for improper vouching purposes. But even if use of the term "corroborated" was inartful, this isolated comment in an otherwise proper argument about Cottrell's testimony does not warrant reversal of defendant's conviction. *See People v. Brownridge (On Remand)*, 237 Mich. App. 210, 216, 602 N.W.2d 584 (1999). Moreover, although the trial court denied [Petitioner's] request for a specific curative instruction, the trial court properly instructed the jurors that they alone must decide the facts of the case and witness credibility, they must decide the case on the evidence properly admitted, the lawyers' statements and arguments were not evidence, and the jurors did not have to believe an expert's opinions. "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People v. Abraham*, 256 Mich. App. 265, 279, 662 N.W.2d 836 (2003). On the whole, there has been no assertion that Cottrell's testimony actually constituted impermissible vouching testimony under *Thorpe*; the prosecutor properly compared the behavior of NE and AE to Cottrell's testimony as allowed under *Peterson*; and a properly instructed jury considered the evidence against [Petitioner]. [Petitioner] was not denied a fair and impartial trial. *See Mann*, 288 Mich. App. at 119, 792 N.W.2d 53.

*Montez*, 2022 WL 726902, at *8–9.

Here, Petitioner does not present to this Court any argument regarding this issue other than the arguments that he raised in his brief on direct appeal. Petitioner, therefore, fails to explain how the court of appeals' analysis is in error. Moreover, Petitioner does not explain how the court of appeals' analysis is contrary to, or an unreasonable application of, the general standards set forth in *Darden* or *Donnelly*.

Upon review of the record, the Court concludes that the court of appeals properly concluded that the prosecution did not vouch for the credibility of the complainants and other witnesses by relying upon Cottrell's testimony. Instead, the prosecutor suggested that the actions of these witnesses, particularly their delayed disclosure of abuse, was entirely consistent with Cottrell's explanations for why delayed disclosure often occurs in child sexual abuse cases. Moreover, at no time did the prosecutor place the prestige of the government behind Cottrell or the other witnesses to bolster their credibility.

Moreover, any suggestion by Petitioner that the prosecution relied upon Cottrell to vouch for the credibility of these witnesses is misplaced. A review of the record cannot lead to the conclusion that Cottrell explicitly vouched for credibility in his testimony. Thus, any suggestion by Petitioner that Cottrell usurped the province of the jury is simply incorrect.

Moreover, it is not clearly established federal law that expert testimony regarding the credibility of a complainant's accusations violates due process. The lower federal courts offer authority supporting the proposition that opinion testimony

regarding the credibility of other witnesses is inappropriate.  *See, e.g., United States v. Hill*, 749 F.3d 1250 (10th Cir. 2014) (collecting federal circuit court authority); *Esch v. Cnty. of Kent*, 699 F. App'x 509, 517 (6th Cir. 2017) (citing *Hill*); *Greenwell v. Boatwright*, 184 F.3d 492, 495–97 (6th Cir. 1999) (stating with regard to the expert's testimony "as to the validity of statements made by other witnesses . . .  we agree with the plaintiffs that the expert statements were inadmissible opinion testimony . . ."). But that authority is focused on whether the testimony is permissible under the Federal Rules of Evidence and, even with that non-constitutional focus, there is no Supreme Court authority stating that proposition.  *Hill*, 749 F.3d at 1258 (relying on "the 'weight of authority from other circuits'. . . [in the] absen[ce of] a holding from. . . the Supreme Court").

Moreover, the fundamental premise of much of the lower court authority—that expert testimony regarding witness credibility is inappropriate because it invades the province of the jury[3]—has been called into question by the Supreme Court.  In 1943,

---

[3] That is also the premise of the state law limitation on such evidence. Michigan law holds that a witness may not provide an opinion on the credibility of another witness:

> It is "[t]he Anglo-Saxon tradition of criminal justice . . . [that] makes jurors the judges of the credibility of testimony offered by witnesses." *United States v. Bailey*, 444 U.S. 394, 414, 100 S. Ct. 624, 62 L. Ed. 2d 575 (1980). Because it is the province of the jury to determine whether "a particular witness spoke the truth or fabricated a cock-and-bull story," *id.* at 414 415, 100 S. Ct. 624, it is improper for a witness or an expert to comment or provide an opinion on the credibility of another person while testifying at trial. *People v. Buckey*, 424 Mich. 1, 17, 378 N.W.2d 432 (1985). *See also People v. Peterson*, 450 Mich. 349, 352, 537 N.W.2d 857 (1995). Such comments have no probative value, *Buckey*, 424 Mich. at 17, 378 N.W.2d 432, because "they do nothing to assist the jury in assessing witness credibility in its fact-finding mission and in determining the ultimate issue of guilt or innocence." *Connecticut v.*

the Supreme Court interpreted the Federal rules of Evidence and considered the admissibility of expert testimony that was challenged on the basis that it "invaded the jury's province." *United States v. Johnson*, 319 U.S. 503, 519 (1943). The Supreme Court was not troubled by the fact that the expert testified regarding ultimate issues:

> No issue was withdrawn from the jury. The correctness or credibility of no materials underlying the expert's answers was even remotely foreclosed by the expert's testimony or withdrawn from proper independent determination by the jury. The judge's charge was so clear and correct that no objection was made, though, of course, there were exceptions to the refusal to grant the usual requests for charges that were either redundant or unduly particularized items of testimony. The worth of our jury system is constantly and properly extolled, but an argument such as that which we are rejecting tacitly assumes that juries are too stupid to see the drift of evidence. The jury in this case could not possibly have been misled into the notion that they must accept the calculations of the government expert any more than that they were bound by the calculations made by the defense's expert based on the defendants' assumptions of the case. So long as proper guidance by a trial court leaves the jury free to exercise its untrammeled judgment upon the worth and weight of testimony, and nothing is done to impair its freedom to bring in its verdict and not someone else's, we ought not be too finicky or fearful in allowing some discretion to trial judges in the conduct of a trial and in the appropriate submission of evidence within the general framework of familiar exclusionary rules.

---

*Taft*, 306 Conn. 749, 764, 51 A.3d 988 (2012) (citation and quotation marks omitted). *See also People v. Row*, 135 Mich. 505, 507, 98 N.W. 13 (1904) (explaining that opinion testimony regarding a complainant's veracity is not competent evidence). As a result, such statements are considered "superfluous" and are "inadmissible lay witness [ ] opinion on the believability of a [witness's] story" because the jury is "in just as good a position to evaluate the [witness's] testimony." *People v. Smith*, 425 Mich. 98, 109, 113, 387 N.W.2d 814 (1986).

*People v. Musser*, 494 Mich. 337, 835 N.W.2d 319, 327 (2013) (footnote omitted).

26

*Johnson*, 319 U.S. at 519–20.  Federal Rule of Evidence 704(a)[4] expressly states that

"[a]n opinion is not objectionable just because it embraces an ultimate issue."  *Id*.

Federal Rule of Evidence 704 was passed for the express purpose of abolishing case

law that held that witnesses could not express opinions on ultimate issues.  *See*

Advisory Committee Notes, Fed. R. Evid. 704.  In *Scheffer*, in a concurring opinion,

Justice Kennedy quoted the Advisory Committee Notes to explain the change:

> The older cases often contained strictures against allowing witnesses to express opinions upon ultimate issues, as a particular aspect of the rule against opinions.  The rule was unduly restrictive, difficult of application, and generally served only to deprive the trier of fact of useful information. 7 Wigmore §§ 1920, 1921; McCormick § 12. The basis usually assigned for the rule, to prevent the witness from "usurping the province of the jury," is aptly characterized as "empty rhetoric." 7 Wigmore § 1920, p. 17.

*Scheffer*, 523 U.S. at 319.

Even if the Supreme Court concluded that the Federal Rules of Evidence did

not allow expert testimony regarding witness credibility, that would not be sufficient

to permit habeas relief.  Where "the Supreme Court has addressed whether . . .

testimony is permissible under the Federal Rules of Evidence . . . [but] it has not

explicitly addressed the issue in constitutional terms . . . there is no Supreme Court

precedent that the trial court's decision could be deemed 'contrary to,' under the

AEDPA." *Bugh v. Mitchell*, 329 F.3d 496, 513 (6th Cir. 2003).  Put simply, in light of

the United States Supreme Court's decision in *Johnson*, and the express disavowal

of the notion that expert testimony on an "ultimate issue" is objectionable, the Court

---

[4] The parallel Michigan Rule of Evidence is virtually identical. *See* Mich. R. Evid. 704.

concludes that even if Cottrell's testimony addressed the ultimate issue of the various witnesses' credibility, it would not violate the clearly established law regarding the limits of due process.

Moreover, while Petitioner contends that the trial court erred by refusing to give a detailed curative instruction regarding the prosecution's use of the term "corroborate," the court of appeals properly noted that the trial court instructed the jury to consider only the evidence admitted at trial, and that counsel's closing arguments did not constitute evidence. (Trial Tr. V, ECF No. 8-7, PageID.1305.) A jury is presumed to follow its instructions. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Petitioner has not demonstrated that the remarks made by the prosecutor during closing arguments "so infected the trial with unfairness" that he was denied due process. *See Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 643).

In sum, for the reasons set forth above, Petitioner is not entitled to relief with respect to habeas ground II.

### 2.    Ground III—Complainant's Breakdown

As his third ground for relief, Petitioner contends he was denied a fair trial when "the complaining witness had an emotional breakdown and her loved ones rushed to the witness stand to comfort her in front of the jury, and the trial court did nothing to cure the error." (§ 2254 Pet., ECF No. 1, PageID.9.) Petitioner contends the error is twofold. First, he argues the trial court should have questioned the jurors as to whether they could still be impartial after witnessing the outburst. (*Id.*) Second, Petitioner avers that the trial court failed to give a curative instruction, damaging the "fairness and integrity of the proceedings." (*Id.*) Petitioner suggests that the

damage was "exacerbated" because the "spectacle was from a witness of whose allegations [he] was acquitted." (*Id.*)

The court of appeals addressed Petitioner's argument as follows:

Factually, [Petitioner's] argument relates to a recess taking during AE's direct-examination testimony. While being asked about the incident of sexual abuse allegedly perpetrated by defendant, AE began to cry and the trial court ordered a recess. Following a short recess, trial reconvened and AE continued her testimony. [Petitioner] made no objection during these events, and [Petitioner] did not request a curative instruction, a mistrial, or any other relief. This is the entirety of the incident as reflected in the original record that forms the basis for our review. *See* MCR 7.210(A).

[Petitioner] has not established plain error in the trial court's decision to call a recess when AE became emotional during her testimony. "It is well established that the trial court has a duty to control trial proceedings in the courtroom and has wide discretion and power in fulfilling that duty." *People v. Biddles*, 316 Mich. App. 148, 153, 896 N.W.2d 461 (2016). The trial court's authority to insist that a case is tried in a proper and orderly manner includes discretion in responding to outbursts in the courtroom. *See People v Inman*, 315 Mich. 456, 473–474, 24 N.W.2d 176 (1946). Emotional reactions by victims and others have been described as a "natural" response to reliving events during trial, 99 ALR 6th 113, and depending on the facts of a case, evidence of a victim's "emotional state" may actually be relevant to evaluating a victim's credibility or the weight to give testimony by others who have described the victim's emotional state following a crime, *see People v. Shorter*, 324 Mich. App 529, 541, 922 N.W.2d 628 (2018). At that same time, there is a risk that "such emotional reactions may be unfair to the defendant, as the jury may convict the defendant not on the basis of actual evidence but on the basis of mere sympathy with the victims." 99 ALR 6th 113.

As one example of an emotional outburst and the trial court's response thereto, in *People v. Gonzales*, 193 Mich. App. 263, 264-265, 483 N.W.2d 458 (1992), the victim had an "outburst" during cross-examination by defense counsel and exclaimed: "I have never slept with the scum and what happened to me is not right, and I'm through cooperating with you; do you understand me? He's an ass hole, murderer, and I don't care if I blew this case." The defendant moved for a mistrial or, in the alternative, for a curative instruction. *Id.* at 265, 483 N.W.2d 458. The trial court denied the mistrial but read a curative instruction to the jury,

and this Court found no error on appeal. *Id.* at 265–266, 483 N.W.2d 458. Another example of a courtroom disturbance may be found in *People v. Bauder*, 269 Mich. App. 174, 194–195, 712 N.W.2d 506 (2005), overruled in part on other grounds as recognized in *People v. Burns*, 494 Mich. 104, 112–113, 832 N.W.2d 738 (2013). That case involved a "courtroom outburst by the victim's brother," who yelled that the defendant had "killed his sister." *Id.* The defendant moved for a mistrial, which the trial court denied. *Id.* at 194, 712 N.W.2d 506. The trial court, however, took other steps to preserve defendant's right to a fair and impartial trial, which included asking the jurors if they could disregard the outburst and remain impartial as well as instructing the jury that the outburst was not evidence. *Id.* at 194–195, 712 N.W.2d 506.

In this case, in response to AE's crying on the witness stand and her request for her medication, the trial court promptly called a recess and removed the jury from the courtroom. Unlike in *Gonzalez* and *Bauder*, [Petitioner] did not object or move for a mistrial or request any other action, such as a curative instruction or questioning the jury. Yet, on appeal, [Petitioner] now claims that the trial court should have sua sponte undertaken such action. But in the cases on which he relies— e.g., *Gonzalez* and *Bauder*—the defendants objected to the outbursts and requested relief. [Petitioner] cites no authority for the proposition that the trial court was required to sua sponte poll the jury or issue a curative instruction when AE became emotional on the stand. *See generally People v. Rice*, 235 Mich. App. 429, 444, 597 N.W.2d 843 (1999).

[Petitioner] also cites no authority for his assertion that the recess called by the trial court was categorically inadequate to address any potential prejudice. As noted, the trial court has wide discretion in controlling and maintaining order in the courtroom. *See Inman*, 315 Mich. at 473–474, 24 N.W.2d 176; *Biddles*, 316 Mich. App. at 153, 896 N.W.2d 461. In this case, the trial court exercised that discretion by calling a recess and removing the jury from the courtroom when AE became emotional. The trial court was in the best position to assess AE's emotional demeanor and any potentially prejudicial effect on the jury. *See generally People v. Albers*, 258 Mich. App. 578, 588, 672 N.W.2d 336 (2003); *People v. Lee*, 212 Mich. App. 228, 251, 537 N.W.2d 233 (1995). By the same token, the trial court was in the best position to determine the appropriate response to AE's emotional testimony. In the absence of an objection by [Petitioner] or any other request for relief, [Petitioner] has not shown plain error in the trial court's decision to call a recess rather than sua sponte polling the jury and issuing a curative instruction.

In concluding that [Petitioner] has failed to show plain error, three additional points warrant mention. First, although the trial court did

not issue a curative instruction during AE's testimony, the trial court did instruct the jurors that they "must not let sympathy or prejudice influence [their] decision." "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *Abraham*, 256 Mich. App. at 279, 662 N.W.2d 836. Second, although [Petitioner] now contends that AE's outburst prejudiced him, at trial, defense counsel used AE's outburst to the defense's benefit during closing arguments, contrasting AE's "very emotional" testimony with her "calm, normal" demeanor when speaking with Children's Protective Services. Indeed, as defense counsel evidently recognized, depending on the facts, a witness's emotions may be relevant to assessing credibility, *Shorter*, 324 Mich. App. at 541, 922 N.W.2d 628, and outbursts may be just as likely to impugn credibility as to bolster it. Particularly in view of counsel's use of this incident to benefit the defense, and considering the record before this Court, [Petitioner] has not established that he was prejudiced by AE's outburst. *See People v. Dixon-Bey*, 321 Mich. App. 490, 511, 909 N.W.2d 458 (2017). Third, the jury ultimately returned a verdict of not guilty with respect to the charge related to AE. That the jury returned a not-guilty verdict on this count is a very strong indication that the jury was not swayed in the prosecution's favor by AE's emotional outburst and that the incident did not affect the outcome of trial. For all these reasons, [Petitioner] has not shown plain error, and he is not entitled to relief on appeal.

Finally, we note that, on appeal, [Petitioner] attempts to expand the record by attaching an affidavit—from an intern with the public defender's office who attended [Petitioner's] trial—to his brief on appeal. This affidavit, however, was never presented in the lower court, and [Petitioner] may not now expand the record on appeal. *See People v. Powell*, 235 Mich. App. 557, 561 n 4, 599 N.W.2d 499 (1999). Indeed, [Petitioner] has made no effort to move for the expansion of the record on appeal or to seek an evidentiary hearing to develop a factual record on this issue. *See People v. Elston*, 462 Mich. 751, 762, 614 N.W.2d 595 (2000). Nevertheless, we have reviewed this affidavit, and even if this affidavit is considered, we would conclude that [Petitioner] is not entitled to relief on appeal.

*Montez*, 2022 WL 726902, at *11–12.

Here, Petitioner merely relies upon the arguments that he raised, and that were rejected by, the court of appeals, and so Petitioner fails to explain how the court of appeals' analysis is in error.  Moreover, while the court of appeals relied upon state

law to reject Petitioner's claim for relief, Petitioner has not shown—and he cannot show—that the court of appeals' conclusions are contrary to, or unreasonable applications of, clearly established federal law.  The United States Supreme Court has noted:

> In *Estelle v. Williams* and [*Holbrook v.*] *Flynn,* this Court addressed the effect of courtroom practices on defendants' fair-trial rights. In *Williams,* the Court considered "whether an accused who is compelled to wear identifiable prison clothing at his trial by a jury is denied due process or equal protection of the laws." 425 U.S., at 502, 96 S. Ct. 1691. The Court stated that "the State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes," *id.,* at 512, 96 S. Ct. 1691, but held that the defendant in that case had waived any objection to being tried in prison clothes by failing to object at trial, *id.,* at 512-513, 96 S. Ct. 1691.
>
> In *Flynn,* the Court addressed whether seating "four uniformed state troopers" in the row of spectators' seats immediately behind the defendant at trial denied the defendant his right to a fair trial. 475 U.S., at 562, 106 S. Ct. 1340. The Court held that the presence of the troopers was not so inherently prejudicial that it denied the defendant a fair trial. *Id.,* at 571, 106 S. Ct. 1340. In reaching that holding, the Court stated that "the question must be . . . whether 'an unacceptable risk is presented of impermissible factors coming into play.'" *Id.,* at 570, 106 S. Ct. 1340 (quoting *Williams, supra,* at 505, 96 S. Ct. 1691).
>
> Both *Williams* and *Flynn* dealt with government-sponsored practices: In *Williams,* the State compelled the defendant to stand trial in prison clothes, and in *Flynn,* the State seated the troopers immediately behind the defendant. Moreover, in both cases, this Court noted that some practices are so inherently prejudicial that they must be justified by an "essential state" policy or interest. *Williams, supra,* at 505, 96 S. Ct. 1691 (concluding that the practice "further[ed] no essential state policy"); *Flynn, supra,* at 568–569, 106 S. Ct. 1340 (holding that the practice was not of the sort that had to be justified by an "essential state interest").

*Carey v. Musladin*, 549 U.S. 70, 75 (2006).  The *Carey* Court then went on to explicitly state: "This Court has never addressed a claim that such private-actor courtroom

conduct was so inherently prejudicial that it deprived a defendant of a fair trial." *Id.* at 76.

Given the lack of Supreme Court precedent suggesting that a defendant's right to a fair trial is violated by an emotional outburst such as the one at issue here, the court of appeals' rejection of Petitioner's claim cannot have been contrary to, or an unreasonable application of, clearly established federal law. *See id.* ("Given the lack of holdings from this Court [on the issue at hand], it cannot be said that the state court 'unreasonably applied clearly established Federal law.'"). Moreover, although Petitioner faults the trial court for not holding a hearing to assess the jurors' impartiality after the outburst and subsequent recess, the Constitution does not require "a trial court to *sua sponte* conduct a full-blown evidentiary hearing every time a courtroom spectator [or participant] makes a comment within the jury's hearing." *White v. Smith*, 984 F.2d 163, 166 (6th Cir. 1993). Simply put, the trial court's "failure to *sua sponte* conduct an evidentiary hearing to assess juror prejudice did not involve an 'infraction [] that violate[s] 'fundamental fairness.'" *Id.* (quotation omitted).

Furthermore, despite Petitioner's contention that the trial court did not issue a curative instruction, the record reflects that during final jury instructions, the trial court instructed the jury to "not let sympathy and prejudice influence [its] decision." (Trial Tr. V, ECF No. 8-7, PageID.1303.) As set forth *supra*, jurors are presumed to follow their instructions. *See Weeks*, 528 U.S. at 234. Notably, as mentioned by the court of appeals, the jury acquitted Petitioner of the charge involving AE.

Presumably, had the jury been swayed by AE's emotional outburst, it would have convicted Petitioner of that charge notwithstanding the evidence presented by the prosecution. Given Petitioner's acquittal on that charge, the Court cannot conclude that the emotional outburst and the way that it was handled by the trial court violated Petitioner's due process rights.

In sum, for the reasons set forth above, Petitioner is not entitled to relief with respect to habeas ground III.

### 3.    Ground IV—Civic Duty

As his fourth ground for relief, Petitioner contends that he was denied a fair trial "when the prosecutor appealed to the jury's sympathies and sense of civic duty in closing argument." (§ 2254 Pet., ECF No. 1, PageID.12.) Petitioner suggests further that the trial court erred by denying his motion for a mistrial and "failing to do anything to address the error." (*Id.*) Specifically, Petitioner takes issue with the fact that the prosecutor implied that the jury would be "revictimizing" the complainants if it did not believe the complainants' testimony, and that the prosecutor vilified Petitioner by "saying his alleged crimes were 'evil' and 'worse than murder,' clearly appealing to emotion rather than fact." (*Id.*)

Petitioner raised these arguments on direct appeal, and the Michigan Court of Appeals addressed them in a thorough discussion, stating:

> [Petitioner] also argues that the prosecutor improperly appealed to the jurors' sympathies and sense of civic duty by arguing that AE and NE faced "revictimization" as a result of having to appear at trial. According to [Petitioner], the trial court abused its discretion by denying his motion for a mistrial or, at a minimum, the trial court should have sua sponte taken some action to address the issue. The prosecutor's revictimization argument was made during rebuttal, in the context of

34

the prosecutor's more general assertion that NE and AE had no reason to lie. As described earlier, the prosecutor repeatedly stated that AE and NE were being revictimized by testifying at trial and that revictimization weighed against any suggestion that they were not testifying truthfully. The prosecutor also had a PowerPoint slide on the subject. Trial counsel objected, and the trial judge gave a contemporaneous instruction to the jury about the use of the word "victim" during the trial.

Considering the prosecutor's arguments as a whole and in context, we initially note that the prosecutor generally couched her revictimization argument in the context of a credibility discussion and an assertion that NE and AE had nothing to gain and no reason to lie by making allegations against defendant. Prosecutors are "generally free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case." *Unger*, 278 Mich. App. at 236, 749 N.W.2d 272. And a prosecutor may comment on witness credibility and argue, based on the evidence, that a witness had no motive to lie. *Thomas*, 260 Mich. App. at 455-456, 678 N.W.2d 631.

That said, a prosecutor should not "invite[ ] jurors to suspend their powers of judgment and decide the case on the basis of sympathy or civic duty." *Lane*, 308 Mich App at 66, 862 N.W.2d 446. In this case in particular, the prosecutor exceeded the bounds of proper argument by arguing that NE and AE faced revictimization as a result of the trial and by asserting that they would be revictimized if they were not believed. *See Unger*, 278 Mich. App. at 237, 749 N.W.2d 272. Such an argument constituted an improper appeal to the jurors' sympathies. *See id.* Indeed, as framed by the prosecutor in this case, NE and AE were "revictimized" by [Petitioner's] exercise of his constitutional right to a trial, including his right to confront the witnesses against him. That is, the prosecutor argued that NE and AE had been revictimized because they came to court, saw [Petitioner], and answered questions before the jury. As argued by the prosecutor, the jury itself was part of the problem because NE and AE faced the risk that "they won't be believed" and that too would constitute revictimization. Certainly, appearing at trial to testify, particularly about a painful topic like sexual abuse, can be a difficult experience. But it is nevertheless true that a jury's determination of guilt must be based on the evidence, not sympathy. These kinds of revictimization arguments—asserting that victims should be believed because they have been revictimized by a trial or because failure to believe them would revictimize them—are improper attempts to arouse the jury's sympathies. *See id.*

35

Although the prosecutor's argument was improper, relief is not warranted on appeal. First, to the extent [Petitioner] sought a mistrial, and argues on appeal that a mistrial should have been granted, a mistrial was not warranted because revictimization arguments—while improper—can be addressed with a curative instruction. *See id.* Second, even though [Petitioner] did not request a curative instruction or propose any particular language for an instruction, the trial court sua sponte instructed the jury that the term "victim" may not be an appropriate description for the complainants in this case, making clear that NE and AE were not "victims" simply because they had made allegations and appeared in court. The trial court also specified that the jury decided issues of credibility and that the jury did not have to accept the prosecutor's arguments. Third, aside from this contemporaneous instruction on "victims" and issues of credibility, the trial court also provided standard jury instruction on assessing credibility, not letting sympathy influence the jury's verdict, and that the lawyers' arguments were not evidence. Jurors are presumed to follow their instructions, and these general instructions, particularly when coupled with the trial court's more specific instruction on "victims," alleviated the prejudice to [Petitioner]. *See id.* Fourth, in concluding that the instructions were sufficient to cure any prejudice to [Petitioner] in this case, it again bears noting that the jury found [Petitioner] not guilty of the charge related to AE. Clearly, notwithstanding the prosecutor's improper revictimization argument, the jury understood its role in assessing credibility and had no qualms about disbelieving one of the alleged victims. On this record, the prosecutor's improper revictimization argument did not deny [Petitioner] a fair and an impartial trial. *See Mann*, 288 Mich. App. at 119, 792 N.W.2d 53. He is not entitled to relief on appeal.

[Petitioner] also argues that the prosecutor erred by (1) comparing child sexual abuse to murder, and (2) describing [Petitioner's] conduct as "evil" and noting that it "doesn't get much worse" than what [Petitioner] did in sexually abusing children who trusted him. Considered in context, the prosecutor's arguments in this regard were not improper. The prosecutor did not inject into trial issues that were broader than [Petitioner's] guilt or ask the jurors to suspend their judgment, but urged the jury to convict [Petitioner] because the evidence established that [Petitioner] was guilty of egregious acts. These arguments focused on the evidence were not improper. *See People v. Hoffman*, 205 Mich. App. 1, 21, 518 N.W.2d 817 (1994). Further, although the prosecutor used "hard language," this was not improper during closing. *See People v. Ullah*, 216 Mich. App. 669, 678, 550 N.W.2d 568 (1996). Even assuming arguendo that there was error, [Petitioner] would not be entitled to relief on appeal because [Petitioner] failed to object and a

timely objection and curative instruction could have alleviated any potential error. *See Unger*, 278 Mich. App. at 237, 749 N.W.2d 272.

*Montez*, 2022 WL 726902, at *10–11.

As an initial matter, Petitioner's suggestion that the prosecutor erred by appealing to the jury's "civic duty" begs the question: what is a "civic duty" argument? There is no clearly established federal law on that point.  The Supreme Court has frequently referenced jury service as a "civic duty," *see, e.g.*, *Dietz v. Bouldin*, 136 S. Ct. 1885, 1896 (2016) ("Juries are of course an integral and special part of the American system of civil justice.  Our system cannot function without the dedication of citizens coming together to perform their civic duty and resolve disputes"), but the Court has never defined, or even commented on, "civic duty" arguments.

Although the Supreme Court has not mentioned "civic duty" arguments, it has commented on the dangers of prosecutorial argument that is "wholly irrelevant to any facts or issues in the case, the purpose and effect of which could only have been to arouse passion and prejudice."  *Viereck v. United States*, 318 U.S. 236, 247 (1943). The prosecutor's challenged argument in *Viereck* was as follows:

> In closing, let me remind you, ladies and gentlemen, that this is war. This is war, harsh, cruel, murderous war. There are those who, right at this very moment, are plotting your death and my death; plotting our death and the death of our families because we have committed no other crime than that we do not agree with their ideas of persecution and concentration camps.

> This is war. It is a fight to the death. The American people are relying upon you ladies and gentlemen for their protection against this sort of a crime, just as much as they are relying upon the protection of the Men who man the guns in Bataan Peninsula, and everywhere else. They are relying upon you ladies and gentlemen for their protection. We are at war. You have a duty to perform here.

37

As a representative of your Government I am calling upon every one of
you to do your duty.

*Id.* at 247 n.3. The *Viereck* Court went on to heartily condemn that argument:

At a time when passion and prejudice are heightened by emotions
stirred by our participation in a great war, we do not doubt that these
remarks addressed to the jury where highly prejudicial, and that they
were offensive to the dignity and good order with which all proceedings
in court should be conducted. We think that the trial judge should have
stopped counsel's discourse without waiting for an objection. "The
United States Attorney is the representative not of an ordinary party to
a controversy, but of a sovereignty whose obligation to govern
impartially is as compelling as its obligation to govern at all; and whose
interest, therefore, in a criminal prosecution is not that it shall win a
case, but that justice shall be done. As such, he is in a peculiar and very
definite sense the servant of the law, the twofold aim of which is that
guilt shall not escape or innocence suffer. He may prosecute with
earnestness and vigor—indeed, he should do so. But, while he may
strike hard blows, he is not at liberty to strike foul ones. It is as much
his duty to refrain from improper methods calculated to produce a
wrongful conviction as it is to use every legitimate means to bring about
a just one." *Berger v. United States*, 295 U.S. 78, 88 [(1935)].

*Id.* at 248.  Although the *Viereck* Court's statement may be stirring, and though it

could provide the foundation for a "civic duty" argument proscription, it is entirely

dicta.  The Court specifically acknowledged that the "duty" argument was not the

error that prompted reversal, but was simply another issue that "might well have

placed the judgment of conviction in jeopardy."  *Id.* at 247.  This Court may consider

only the "clearly established" holdings, and not the dicta, of the Supreme Court.

*Williams*, 529 U.S. at 412; *Bailey*, 271 F.3d at 655.

Labeling an argument a "civic duty" argument does not render that argument

prosecutorial misconduct.  The determination of impropriety requires going deeper;

the deeper inquiry is whether the argument is irrelevant such that its only purpose

38

would be to arouse passion and prejudice.  The fact that the argument invites the jurors to satisfy a civic duty is relevant to that analysis, but it is not dispositive.

In *United States v. Solivan*, 937 F.2d 1146 (6th Cir. 1991), the Sixth Circuit Court of Appeals considered exactly how the "civic duty" analysis fits within the more fundamental inquiry into whether the prosecutor has attempted to appeal to the jurors' passion or prejudice:

> Unless calculated to incite the passions and prejudices of the jurors, appeals to the jury to act as the community conscience are not *per se* impermissible. *See Henderson v. United States*, 218 F.2d 14, 19–20 (6th Cir.), *cert. denied*, 349 U.S. 920 (1955).[2] Our determination of whether comments are calculated to incite prejudice and passion in the jury is informed by the Supreme Court opinion in *Viereck*.
>
> \* \* \*
>
> The remarks in the instant case are analogous to the comments adjudged inflammatory and prejudicial in *Viereck*. The fairness or unfairness of comments appealing to the national or local community interests of jurors in a given instance will depend in great part on the nature of the community interest appealed to, and its relationship to, and the nature of, the wider social-political context to which it refers. The correlation between the community interest comments and the wider social-political context to a large extent controls the determination of whether an appeal is deemed impermissible because it is calculated to inflame passion and prejudice. The Supreme Court in *Viereck* framed the inquiry to incorporate both the purpose and effect of the comments. In that case, in the light of contemporaneous events, which had great impact on the emotions and perceptions of jurors, the remarks "could only have . . . arouse[d] passion and prejudice." *See* [*Viereck*, 318 U.S.] at 247.

_____

[2] Our holding in *Henderson* and the result reached in *Alloway* reflect a general rule followed by other circuits as well. In *United States v. Shirley*, 435 F.2d 1076 (7th Cir. 1970), the Seventh Circuit stated that the prosecutor's closing remarks concerning the increasing number of cars being stolen did not overstep the bounds of fairness and propriety and could not have worked a substantial injury to the defendant in

denying him a fair trial because, even though the statements were not particularly relevant and had no bearing on the guilt or innocence of the defendant, the remarks did not contain an emotional appeal to the jurors' self-interest designed to arouse their prejudice against the defendant. *Id.* at 1079.

The Eighth Circuit has also stated, in a case where the prosecutor told the jurors that they were the public's last shield and the district court instructed the jury to disregard the remark, that unless calculated to inflame, an appeal to the jury to act as the conscience of the community is not impermissible. *United States v. Lewis*, 547 F.2d 1030, 1036 (8th Cir.), *cert. denied*, 429 U.S. 1111 (1976). Similarly, the Eleventh Circuit, in *United States v. Kopituk*, 690 F.2d 1289, 1342–43 (11th Cir.1982), *cert. denied*, 463 U.S. 1209 (1983), stated that appeals to the jury to act as the conscience of the community, unless designed to inflame the jury, are not *per se* impermissible. However, the remarks complained of in *Kopituk* were found by the court to have approached the line demarcating impermissible comment calculated to incite the jury against the accused, but not to have crossed the line into the realm of impropriety and prejudice by directly suggesting that the jurors had personal stakes in the outcome of the case.

*Solivan*, 937 F.2d at 1151–52.  The *Solivan* court went on to review several decisions where circuit courts of appeal had concluded that the argument crossed the line.  For example, in *United States v. Barker*, 553 F.2d 1013, 1024–25 (6th Cir. 1977), the court concluded that it was improper "for a prosecutor to suggest that unless the defendant was convicted it would be impossible to maintain 'law and order' in the jurors' community."  *Solivan*, 937 F.2d at 1152.  Additionally, the *Solivan* court referenced several cases where prosecutors had gone too far in suggesting that their role as jurors permitted them to do something about drug trafficking in their community.  *Id.* at 1152–53.

The *Solivan* court contrasted those cases—cases where the jury was asked to look beyond the evidence against a particular defendant and consider the impact of their verdict on societal problems generally—with the decision in *United States v.*

40

*Alloway*, 397 F.2d 105 (6th Cir. 1968).  In *Alloway*, the court considered the propriety of the following argument:

> You, the jurors, are called upon in this case to be the world conscience of the community. And I'm calling on this jury to speak out for the community and let the John Alloways know that this type of conduct will not be tolerated, that we're not going to tolerate [armed robbery]. . . .

*Alloway*, 397 F.2d at 113.  The *Solivan* court explained why the "conscience of the community" argument in *Alloway* was acceptable while similar argument in *Barker* and *Solivan* was not:

> The comments by the prosecutor in *Alloway* and the comments complained of in the instant case are only vaguely similar. The remarks in this case appear to us to have been deliberately injected into the proceedings to incite the jury against defendant. Given the nature of this case, involving a cocaine transaction, and the wider social context which the prosecutor sought to bring to bear on the proceedings, the national drug problem, the purpose and effect of the comments could have only been to arouse passion and prejudice. *See Viereck*, 318 U.S. at 247. We determined that the statements made in *Alloway* were not deliberately injected into the proceedings to inflame the jury. *See* 397 F.2d at 113. Indeed, examined in the light of the nature of the case and the wider social context in which the case was prosecuted, it is clear that the government's statements in *Alloway* were devoid of the sort of inflammatory content inherent in the prosecutor's statements in this case precisely because there was no comparable specific wider context of national attention and concern present in *Alloway* pertaining to armed robbery. The comments in *Alloway* did not attempt to compare or to associate the defendant with a feared and highly publicized group, such as drug dealers, as did the prosecutor in this case. The prosecutor in *Alloway* did not go beyond a mere allusion to the general need to convict guilty people, as did the prosecutor in this case, and bring to bear upon the jury's deliberations the attendant social consequences of defendant's criminal conduct or urge the jury to convict an individual defendant in an effort to ameliorate society's woes.

> \* \* \*

In *Alloway*, we were presented with remarks by the prosecutor which alluded only to the general criminality of the defendant's conduct in

41

robbing a bank and the general community need to convict guilty people. The comments at issue in *Alloway* constituted a general plea which did not even specifically refer to the crime of armed robbery. Moreover, armed robbery was not and is not the specific focus of national attention as is the drug problem. In the instant case, we find that *Alloway* is inapposite because, in this case, the prosecutor went beyond the scope of the prosecutor's statements in *Alloway*, which constituted a mere innocuous reference to the community or societal need to convict guilty people.

*Solivan*, 937 F.2d at 1154–55.[5] Neither *Solivan* nor *Alloway* are of particularly recent vintage, but more recently, the Sixth Circuit relied on the analysis in *Solivan* and described it as "one of the most cited cases in this circuit regarding attorney appeals to the community conscience . . . ." *United States v. Hall*, 979 F.3d 1107, 1122 (6th Cir. 2020).

Here, the Court need not consider whether the prosecutor's "revictimization" argument in Petitioner's case is more akin to the permissible *Alloway* argument or the flawed argument in *Solivan* because the Michigan Court of Appeals has concluded that the prosecutor's argument was an improper attempt "to arouse the jury's sympathies." *Montez*, 2022 WL 726902, at *10. Instead, the Court will consider whether the court of appeals properly concluded that the prosecutor's argument did not amount to reversible error.

The court of appeals noted that Petitioner had preserved his request for a mistrial on the basis of the prosecutor's "revictimization" argument, but that his

---

[5] The *Solivan* court also noted that "[t]he district court in *Alloway* subsequently instructed the jury to base its verdict solely on the evidence and to consider the prosecutor's argument only as it corresponded with the evidence." *Solivan*, 937 F.2d at 1154. But separate and apart from the remedial instruction, the Sixth Circuit concluded that the argument was not prosecutorial misconduct because it was not, by purpose or effect, intended to inflame the passion and prejudice of the jury.

argument for alternative relief, such as a curative instruction, was not preserved because he had not requested such relief before the trial court. *Id.* at *8. Moreover, Petitioner had not objected to the prosecution's assertions "that [his] conduct was 'evil' or worse than murder." *Id.* The court of appeals, therefore, reviewed Petitioner's unpreserved issues for plain error. *Id.*

Here, although the court of appeals concluded that the prosecutor's "revictimization" comments were improper, Petitioner fails to show that the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 643). Under Michigan harmless error jurisprudence, unpreserved nonstructural constitutional error is reviewed under a plain error standard. *People v. Cornell*, 646 N.W.2d 127, 142–43 (Mich. 2002); *People v. Carines*, 597 N.W.2d 130, 143 (Mich. 1999). To prevail, the defendant must show "a plain error that affected substantial rights." *Carines*, 597 N.W.2d at 143. The Michigan Supreme Court assesses whether the error affected the outcome of the proceeding to determine whether the defendant has made the necessary showing. *People v. Davis*, 983 N.W.2d 325, 336–337 (Mich. 2022) (citing *United States v. Olano*, 507 U.S. 725, 734 (1993)). That is "the same kind of inquiry" the Michigan courts use to determine whether error is harmless: was it "outcome-determinative." *Id.* The Michigan Supreme Court equates "outcome determination" to "prejudice" when separating plain from harmless error, *People v. Vaughn*, 821 N.W.2d 288, 303 (Mich. 2012), and when evaluating the *Strickland*

43

standard for ineffective assistance of counsel, *People v. Harris*, 840 N.W.2d 307, 308 (Mich. 2013).

The impact of an error on the outcome of the proceedings is also the focus of federal harmless error analysis. *See, e.g.*, *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (adopting as the standard for determining whether habeas relief if appropriate "whether the . . . error 'had substantial and injurious effect or influence in determining the jury's verdict.'"); *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (posing the question as "Do I, the judge, think that the error substantially influenced the jury's decision?"); *Brown v. Davenport*, 596 U.S. 118, 126 (2022) (stating that "a state prisoner . . . must show that the error had a 'substantial and injurious effect or influence' on the outcome of his trial" (quoting *Brecht*, 507 U.S. at 637)).  The appellate court's decision that the error was not outcome determinative is the equivalent of a determination that the error was harmless under *Brecht. Kyles v. Whitley*, 514 U.S. 419, 435–36 (1995).

*Brown* states that "a state court's harmless-error determination qualifies as an adjudication on the merits under AEDPA." 596 U.S. at 127.  Accordingly, the Court must defer to that adjudication under § 2254(d)(1) unless the "petitioner persuades [the Court] that no 'fairminded juris[t]' could reach the state court's conclusion under [the Supreme] Court's precedents." *Id.* at 1525 (quoting *Davis v. Ayala*, 576 U.S. 257, 269 (2015)).  This is a standard that is intentionally difficult to meet. *See Woods*, 575 U.S. at 316.

In his petition, Petitioner asserts only that the prosecutor's "revictimization" argument essentially "skewer[ed] [the jury's] impartiality with implicit accusation and shame."  (§ 2254 Pet., ECF No. 1, PageID.12.)   He also contends that the prosecutor's suggestion that Petitioner's crimes were "evil" and "worse than murder" served to "clearly appeal[] to emotion rather than fact."  (*Id.*)  Petitioner, therefore, relies upon the arguments he raised before the court of appeals—arguments that were already rejected.  Petitioner, therefore, fails to explain how the court of appeals' conclusions are in error.  Petitioner simply fails to demonstrate that the prosecutor's error in using the "revictimization" argument, as well as the prosecution's use of the phrases set forth above to describe Petitioner's crimes, had a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 637, particularly in light of NE's testimony regarding the abuse she endured from Petitioner as well as the fact that the jury acquitted Petitioner of the count involving alleged abuse of AE.

Given Petitioner's failure to persuade this Court that no fairminded jurist could reach the conclusion arrived at by the court of appeals, the Court will defer to the court of appeals' determination.  The Court's deference to the court of appeals' determination that any error was not outcome determinative necessarily leads to a conclusion that Petitioner has failed to demonstrate that the court of appeals' rejection of this claim of prosecutorial misconduct is contrary to, or an unreasonable application of, clearly established federal law.

Moreover, Petitioner has failed to persuade this Court that the trial court's failure to declare a mistrial violated Petitioner's due process rights to a fair trial in any way. The decision to grant or deny a mistrial is, generally, a matter under state law, and a challenge to such a decision is not cognizable on federal habeas review. *See, e.g.*, *Barry v. Warren*, No. 19-1855, 2019 WL 7834652, at *3 (6th Cir. Dec. 11, 2019); *Hruby v. Wilson*, 494 F. App'x 514, 516 (6th Cir. 2012). That decision, however, may impact federal constitutional rights. *Arizona v. Washington*, 434 U.S. 497, 514 (1978) ("[A] constitutionally protected interest is inevitably affected by any mistrial decision."). For example, if a mistrial is requested because of perceived unfairness caused by the admission of evidence or improper argument, and the request is denied, the underlying impropriety might result in the denial of due process. Thus, federal habeas courts "have an obligation to satisfy themselves that . . . the trial judge exercised 'sound discretion'" when considering a request to declare a mistrial. *Washington*, 434 U.S. at 514. Filtered through the doubly deferential standard of the AEDPA, "[t]he question . . . is . . . whether the determination of the [state courts] . . . was 'an unreasonable application of...clearly established Federal law.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010).

Here, for the same reasons that the prosecutor's comments during closing argument did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process," *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 637), the trial court's denial of a mistrial also did not violate Petitioner's due process rights. Moreovere, as the court of appeals properly stated, the trial court

instructed the jury not to consider the term "victim" as an appropriate description just because the complainants had made allegations and appeared in court. The trial court also instructed the jury regarding assessments of credibility, not allowing sympathy to influence the verdict, and not considering the lawyers' arguments as evidence. (Trial Tr. V, ECF No. 8-7, PageID.1295, 1305, 1307–1309.) As discussed already, jurors are presumed to follow their instructions. *See Weeks*, 528 U.S. at 234. Petitioner, therefore, fails to demonstrate that the court of appeals' rejection of any assertions of trial court error regarding the prosecutor's comments during closing arguments was contrary to, or an unreasonable application of, clearly established federal law.

Accordingly, for the reasons set forth above, Petitioner is not entitled to relief with respect to habeas ground IV.

### C.    Ground V—Cumulative Error

As his fifth ground for relief, Petitioner contends that "individually and/or cumulatively, the above grounds entitle [him] to a new trial." (§ 2254 Pet., ECF No. 1, PageID.15.) Petitioner raised this ground on direct appeal, and the court of appeals rejected it, stating:

> [Petitioner] also argues that the claims of error we have already discussed—even if insufficient to merit relief individually—entitle [Petitioner] to a new trial if considered cumulatively. "The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even when any one of the errors alone would not merit reversal, but the cumulative effect of the errors must undermine the confidence in the reliability of the verdict before a new trial is granted." *People v. Dobek*, 274 Mich. App. 58, 106, 732 N.W.2d 546 (2007). "In making this determination, only actual errors are aggregated to determine their cumulative effect." *People v. Bahoda*, 448 Mich. 261, 293 n 64, 531 N.W.2d 659 (1995). In this case, as we have discussed, [Petitioner's] only

claim of error with merit relates to the prosecutor's revictimization argument, which improperly appealed to the jurors' sympathies. And, as already discussed, this error did not, on its own, warrant a new trial. Given that there is only one actual error and that error does not warrant reversal, [Petitioner] has not shown that the cumulative effect of multiple errors warrants relief on appeal. *See Dobek*, 274 Mich. App. at 106, 732 N.W.2d 546.

*Montez*, 2022 WL 726902, at *13.

Under the AEDPA, a court may only grant habeas relief based on a misapplication of Supreme Court law. *See Bailey*, 271 F.3d at 655. The Sixth Circuit has noted that "[i]ndividually non-prejudicial errors, when taken together, may result in a fundamentally unfair trial that violates a defendant's due process rights." *United States v. Stuckey*, 253 F. App'x 468, 492 (6th Cir. 2007) (citing *United States v. Pierce*, 62 F.3d 818, 834–35 (6th Cir. 1995)); *see also Cockream v. Jones*, 382 F. App'x 479, 486 (6th Cir. 2010) (noting that "only actual *errors* may combine to generate cumulative prejudice"); *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004) (setting forth that aggregated harmless errors require reversal in situations where "the combined effect . . . was so prejudicial as to render [a] trial fundamentally unfair"). On the other hand, the Sixth Circuit has also repeatedly stated that cumulative error claims are not cognizable on habeas review. *See Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002); *see also Keith v. Mitchell*, 455 F.3d 662, 679 (6th Cir. 2006); *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006); *Baze v. Parker*, 371 F.3d 310, 330 (6th Cir. 2004); *Millender v. Adams,* 376 F.3d 520, 529 (6th Cir. 2004); *Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir. 2002). In any event, Petitioner has not convinced this Court that any error requiring a new trial occurred during his criminal

proceedings.  Petitioner, therefore, is not entitled to relief with respect to habeas ground V.

### D.    Ground VI—PSIR Issues

As his final ground for relief, Petitioner contends that his PSIR included "irrelevant information, i.e., descriptions and references of acquitted conduct."  (§ 2254 Pet., ECF No. 1, PageID.16.)  Petitioner suggests that because of this inclusion, he was sentenced pursuant to inaccurate information.  (*Id.*)  Petitioner faults counsel for not objecting to the inclusion of this information.  (*Id.*)

Petitioner raised this ground on direct appeal, and the Michigan Court of Appeals rejected it, stating:

> Next, [Petitioner] challenges the information included in his presentence investigation report. Specifically, [Petitioner] asserts that information relating to AE's allegations—as recounted in the agent's description of events—should be stricken from the presentence investigation report because it relates to acquitted conduct and it is simply not relevant. Although [Petitioner] preserved this issue by raising it in his motion for remand filed with this Court, he did not raise this issue at sentencing. *See* MCR 6.429(C); *People v. Lloyd*, 284 Mich. App. 703, 706 & n. 1, 774 N.W.2d 347 (2009). Accordingly, we do not have a trial-court ruling to review. Thus, we must address this issue in the first instance akin to de novo review.

> As noted by [Petitioner], the agent's description of the offense in the presentence investigation report includes a summary of events related to AE as well as NE, specifically detailing AE's disclosures during the Children's-Protective-Services investigation, her allegations against [Petitioner], and her disclosures to NE, which resulted in NE also coming forward to speak with authorities about [Petitioner's] abuse. The presentence investigation report also clearly states, however, that [Petitioner] was found not guilty of Count I—the charge related to AE.

> [Petitioner] is correct that "a sentencing court may not rely even in part on acquitted conduct when imposing a sentence for the defendant's conviction." *People v. Stokes*, 333 Mich. App. 304, 310, 963 N.W.2d 643 (2020). It does not follow, however, that information about acquitted

conduct cannot appear in a presentence investigation report. As explained by this Court:

> [A] sentencing court may review a [presentence investigation report] containing information on acquitted conduct without violating *Beck*[2] so long as the court does not rely on the acquitted conduct when sentencing the defendant. *Beck* supports this conclusion. In *Beck*, our Supreme Court remanded for resentencing because the sentencing court unquestionably "relied" on acquitted conduct for its sentencing decision. A sentencing court that reviews a [presentence investigation report] that merely contains information about acquitted conduct, however, does not necessarily rely on such information when sentencing a defendant. There must be some evidence in the record that the sentencing court relied on such information to warrant finding a *Beck* violation. Had the sentencing court specifically referenced acquitted offenses as part of its sentencing rationale, a *Beck* violation would be apparent. But when [presentence investigation reports] prepared by the Department of Corrections merely refer to an acquittal by a jury of offenses in a separate case, and the sentencing court does not refer to or expressly rely upon such acquitted offenses as part of its sentencing rationale, this Court cannot conclude that the sentencing court committed a *Beck* violation because such a conclusion would rest on speculation that acquitted conduct influenced the sentencing court's decision. [*Id.* at 311-312, 963 N.W.2d 643 (citation omitted).]

Under *Stokes*, information about AE need not be stricken from the presentence investigation report merely because it involves acquitted conduct. [Petitioner] does not argue on appeal, and the record does not suggest, that the trial court relied on the information related to AE when sentencing [Petitioner]. Absent some indication that the trial court improperly relied on this information, [Petitioner] cannot show error related to acquitted conduct. See *id.*

Although acknowledging this Court's decision in *Stokes*, [Petitioner] asserts that *Stokes* is not dispositive of his arguments because *Stokes* did not address whether information related to acquitted conduct is relevant. Information that is irrelevant or inaccurate should not be included in the presentence investigation report. *See People v. Waclawski*, 286 Mich. App. 634, 690, 780 N.W.2d 321 (2009). But it is also true that the scope of the presentence investigation report, as an information-gathering tool, is "necessarily broad." *Morales v. Mich. Parole Bd.*, 260 Mich. App. 29, 45–46, 676 N.W.2d 221 (2003). Under

MCR 6.425(A)(1)(b), the presentence investigation report must include "a complete description of the offense *and the circumstances surrounding it.*" (Emphasis added). Information regarding the investigation of an offense forms part of the circumstances surrounding an offense, and such information is not excludable merely because the investigation also involved other crimes. That is, as detailed in the presentence investigation report, it was AE's allegations of abuse that prompted the involvement of Children's Protective Services and the police, and it was AE's disclosure to NE and the authorities' investigation into AE's allegations that prompted NE's own disclosures of the abuse that constitutes the basis for [Petitioner's] conviction. In this context, the investigation of AE's allegations—as the catalyst for and part of—the investigation of NE's complaint against defendant formed part of the circumstances surrounding the offense. This information was properly included in the broad scope of the presentence investigation report under MCR 6.425(A)(1)(b). Thus, [Petitioner] is not entitled to a remand to have information related to AE struck from the presentence investigation report. Having concluded that there was no error in the inclusion of this information in the presentence investigation report, we also conclude that any objection from trial counsel would have been futile and, therefore, cannot establish ineffective assistance of counsel. *See Thomas*, 260 Mich. App. at 457, 678 N.W.2d 631.

*Montez*, 2022 WL 726902, at *13–14.

As an initial matter, Petitioner's challenge to the inclusion of acquitted conduct in his PSIR relies upon Petitioner's interpretation of state law governing the inclusion of information in PSIRs.  Such a claim is typically not cognizable in federal habeas corpus proceedings.  *See Hutto v. Davis*, 454 U.S. 370, 373-74 (1982) (discussing that federal courts normally do not review a sentence for a term of years that falls within the limits prescribed by the state legislature); *Austin v. Jackson*, 213 F.3d 298, 301–02 (6th Cir. 2000) (holding that the alleged violation of state law with respect to sentencing is not subject to federal habeas relief).  Petitioner, however, appears to suggest that the trial court violated Petitioner's due process rights by relying upon

inaccurate and irrelevant information—i.e., the acquitted conduct—when imposing Petitioner's sentence.  (§ 2254 Pet., ECF No. 1, PageID.16.)

A sentence may violate due process if it is based upon material "misinformation of constitutional magnitude." *Roberts v. United States*, 445 U.S. 552, 556 (1980); *see also United States v. Tucker*, 404 U.S. 443, 447 (1972); *Townsend v. Burke*, 334 U.S. 736, 741 (1948).  To prevail on such a claim, the petitioner must show (1) that the information before the sentencing court was materially false, and (2) that the court relied on the false information in imposing the sentence.  *Tucker*, 404 U.S. at 447; *United States v. Stevens*, 851 F.2d 140, 143 (6th Cir. 1988); *United States v. Polselli*, 747 F.2d 356, 358 (6th Cir. 1984).  A sentencing court demonstrates actual reliance on misinformation when the court gives "explicit attention" to it, "found[s]" its sentence "at least in part" on it, or gives "specific consideration" to the information before imposing sentence.  *Tucker*, 404 U.S. at 444, 447.

Here, Petitioner does not identify any "false" or "inaccurate" information that was before the sentencing court. Instead, he speculates that the trial court relied upon the acquitted conduct that was included in his PSIR when imposing sentence. Petitioner's suggestion, however, is wholly belied by the record before this Court. Instead, the record indicates that at no time during sentencing did the parties mention, or the trial court rely on, any of the information related to the conduct for which Petitioner was acquitted during sentencing proceedings.  (*See generally* ECF No. 8-8.)  Petitioner, therefore, has failed to demonstrate that his sentence was based upon material misinformation of constitutional magnitude and, for that reason,

violates due process. *See, e.g., Brown v. Rewerts*, No. 19-1771, 2020 WL 8073624, at *2 (6th Cir. Sept. 1, 2020) (noting that "Brown failed to identify any facts found at sentencing that were based on materially false information[; therefore, r]easonable jurists would agree that Brown's claim regarding the trial court's compliance with Michigan's scoring process and the resulting sentencing guidelines calculation asserts only a matter of the application of state sentencing laws"); *Hrrahman v. Rivard*, No. 17-1862, 2017 WL 7036543, at *2 (6th Cir. Dec. 21, 2017) ("The district court correctly determined that Hrrahman did not identify any facts found by the trial court at sentencing that were materially false or based on false information." [Thus,] Hrrahman failed to demonstrate that his sentence violated due process.").

Furthermore, in light of the foregoing, the Court cannot agree with Petitioner that counsel was ineffective for failing to challenge the inclusion of the acquitted conduct in his PSIR, nor was counsel ineffective for failing to argue that Petitioner's sentence was based upon inaccurate or irrelevant information. "[O]mitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013); *see also Mahdi v. Bagley*, 522 F.3d 631, 638 (6th Cir. 2008) ("No prejudice flows from the failure to raise a meritless claim."). Petitioner, therefore, is not entitled to relief with respect to habeas ground VI.

## IV.    Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claim. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's denial of Petitioner's claim was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## **Conclusion**

The Court will enter a judgment denying the petition, as well as an order denying a certificate of appealability.

Dated:  June 13, 2025                    /s/ Phillip J. Green
                                          PHILLIP J. GREEN
                                          United States Magistrate Judge